We'll hear argument next in Case 11-697, Kirtsaeng v. John Wiley & Sons. Mr. Rosenkranz. Thank you, Mr. Chief Justice, and may it please the Court. This case presents a stark choice between two plausible definitions of the phrase lawfully made under this title. Our definition is the more consistent with the English language and is the only definition that does not do mischief with the same use of that phrase each time it's repeated. Ours is the only one consistent with a 400-year common law history and 65-year-old right that was in the statute through 1976, and consistent with the principle that Congress doesn't abolish those things without being clear. Ours gives the copyright owners much of what they asked for when they were seeking an importation provision, just not everything, whereas Wiley's grants them rights far beyond anything that anyone could have imagined asking for back then. Ours is the only one. And the right owner loses control of distribution everywhere. That's — that is essentially your — That is correct, Your Honor. And to put a finer point on it, ours is that lawfully made under this title means made wherever in a way that satisfies U.S. copyright standards, made in accordance with — So this notion of sold anywhere, end of distribution rights everywhere, that has been called, I think, the universal exhaustion principle. International exhaustion, yes, Your Honor. And we are told that no country has adopted that international exhaustion regime, that most countries adhere to the national exhaustion regime, which nobody is contesting here, that is, if it's manufactured in the United States and sold in the United States, but if the exhaustion doctrine applies only nationally, then your argument is asking for something that runs against the regime that is accepted in most places. Your Honor, I have a few answers to that. The first is it is not true that no country adopts national exhaustion. Congress adopted national exhaustion in sections 905 and 906, six years after the statute was passed, as to microchips. But second, Wiley is making the point that there is now a norm. They say most States, most countries, that is. Back in 1976, Wiley is not even arguing that there was any international norm, much less that the drafters of the statute were focused on international norms. And the truth is that there isn't an international consensus around national exhaustion. We know that for a fact, in 1994, when 125 nations got together, they agreed to disagree on international copyright exhaustion principles, and they codified that disagreement to each his own in the TRIPS agreement. Ginsburg. Well, let's take, for example, the European Union, the position in those countries. Suppose we just transformed this, transferred this case to one of those countries, the exact same case. My understanding is that they would follow the national exhaustion. No, Your Honor, and not to quibble, they don't follow national exhaustion. They follow regional exhaustion. So the question is the same. Ginsburg. Yes, but not exhaust a copy in Thailand, then it's home free all over the world. Agreed, Your Honor. But it is regional. It's not national. And the point here is we've got to, of course, read what Congress wrote. What Congress wrote was lawfully made under this title, not lawfully made in the United States, or not lawfully made under this title and made in the United States. When Congress wants to say that, Congress says that very explicitly. Do you mean by lawfully made under this title, simply lawfully made in a manner that does not violate United States copyright law? No, Your Honor. Just, I would say lawfully made under this title means lawfully made in a manner that does not violate the standards or standards. Standards, okay. So it could be lawfully made in England, let's say, in a country that has compulsory licensing. It could be lawfully made there, but it would not be lawfully made under our copyright law, because we don't have that. Yes, Your Honor. Let me give an example that actually is consistent with what we're saying. So they, at least they are correct in contending that what you're arguing for is not lawfully made under, lawfully made if the United States copyright law had applied where it was made. Is that what you're saying? No, Your Honor. And the reason is that that statute that you just described would do only a third of the job of the first sale doctrine. Everyone agrees the first sale doctrine applies at a minimum to products made in the United States. And if you use that counterfactual, if U.S. law had applied, it would indicate that it does, that the first sale doctrine does not apply in situations where it was made in the United States. So the counterfactual simply. I don't follow that. So the first sale doctrine applies to goods made in the United States and to goods made outside the United States is our argument. If it applies in the United States, if we're talking about goods made in the United States, the counterfactual, if this title had applied, would not work, because this title does apply to the goods made in the United States. And that's the core of the first sale doctrine. So, Mr. Rosenkranz, is what, is your theory of this statute essentially that this language means non-paradical copies as that's defined by U.S. copyright law? Rosenkranz, Yes, Your Honor. If I may just change one word, because paradical is a mischievous word. Back in the day, when the 1976 statute was passed, paradical meant unlawful under the laws of other countries. Kagan, No. Rosenkranz, Yes. Kagan, As defined by U.S. copyright law. Rosenkranz, Absolutely. And the key. Kagan, So that's what the statute means. The statute, in your view, is setting up a distinction between paradical, pirated, whatever the term is, copies. Rosenkranz, Counterfeit. Kagan, And other copies, and saying that that distinction should be measured by U.S. copyright law. Rosenkranz, That is right. And, Your Honor, the reason was, what was driving copyright owners crazy was this notion that there were lawless States out there that had no significant copyright protection, and we were applying their standards to products that were infiltrating the U.S. market. And one of the most important things to underscore here, which I think got lost in the Costco argument, is that the space, that 602 does an enormous amount of work, even with 109, the First Sale Doctrine, carved out of it. Copyright owners wanted three things out of the 1976 Act with respect to importation. And they got two and a half of them. The first was what we've just been talking about, Your Honor. It was driving them crazy that there were lawless States out there. They gave the example of Russia, which, where an agency approved the making and distribution within Russia of classic English language works, they got imported to the U.S., and they were competing with U.S. works, U.S. copies within our domestic market. And they got their wish to shut that down, to use U.S. law as the standard for those works. Secondly, they got coverage for copies that were lawfully made, but stolen. And this was the one ask that the film industry had. We've seen in the colloquies. They rented films abroad. The films, that was their business model. The films would get stolen, and the U.S. market would be awash with stolen films. And so they wanted to shut down with the importation provision those stolen goods coming into the U.S. market. And the third thing that they wanted is what's been dominating this debate. But it's only the third thing, and that was help dividing geographic markets, so that they could go after the rogue distributors, yes, but also go after the downstream sales. They got half of that. They got a cause of action against the rogue distributors. They did not get a cause of action that went downstream. Sotomayor, Mr. Rosenkranz, can I ask you, just, it is a practical question, but I think it has a theoretical impact. A manufacturer can choose to contract, or a copyright holder, choose to contract with someone here to manufacture their goods. They could contract with someone abroad, anywhere in the world, directly. They can choose to license their trademark and permit a distributor abroad to manufacture under their U.S. copyright, or they can permit a licensee to register the copyright abroad and distribute. In your definition of lawfully made under this title, does lawfully made under this title apply to all of those situations? i.e., I think clearly to the manufacturer who manufactures abroad. Yes. Sotomayor, clearly to the manufacturer who licensed a distributor to do it for it. But does it also apply to the copyright owner who basically gives the copyright to a foreign distributor and lets the foreign distributor register it abroad? Yes, Your Honor. The only question under our definition is, was the making lawful, which is to say, was it authorized, whether it's by transfer of licensing or by transfer of copyright or in any other way? Is it lawful as measured by U.S. standards? And the the That is broader than I thought, and I'm not quite sure why you don't mean if this manufacturing under the English copyright, because the distributor has an English copyright, is not manufacturing under the U.S. copyright. They're manufacturing under the English copyright. Right. And, Your Honor, the reason that the language works the way we've described is because we are not focusing on whether the making was under this title. We're focusing on whether it was lawful under this title. Does this – would this title, when you apply it to wherever it happens to be, whether in the United States or abroad, would this title say that this is authorized? Now, let me just circle back again. The reason if this title had been applicable doesn't work is because there are enormous numbers of situations, probably three-quarters of them that the first sale doctrine applies to, where this title does apply. And so trying to say where, you know, if this title had applied would work for foreign goods coming in, but not for U.S. goods, which is the core of the first. Breyer. You don't have to say you say both. Either it was manufactured directly and received an American copyright and satisfied all the conditions, or if that wasn't the case, it was manufactured in a way that satisfied the conditions of the American statute, even though for technical reasons it didn't apply. Yes, Your Honor. And in fact, H.Q. That's what your argument is, I take it. Yeah. But in 2008 – We're off on a kind of curly queue here. Yes, Your Honor. But so what Congress did was to find a much simpler, more efficient way to say all of that. In 2008, it figured that out and put – I take it that the reason they wrote to change the statute was just because they were worried about bailees or lessees or somebody under the old statutes not satisfying the first – they were worried about that – somebody, a printer, lawfully obtains a book and he shouldn't have advantage of the first sale doctrine. He's in the middle of printing it. And therefore, you have to change the language. So they changed the language to lawfully made under this title. Am I right? Or if I'm wrong, why did they change it? Your Honor, that is exactly right. And just not to diminish it. Is it all right? Wasn't there also the question of allowing manufacturers to segment markets? So we'd have the copyright abroad governed by foreign law, copyright in the United States governed by U.S. law. Wasn't segmentation of the market allowing people to do just what these people are doing? So, Justice Ginsburg, my answer to Justice Breyer was about why the language in 109 was changed, that is, from obtained possession to lawfully made. And that, what Justice Breyer pointed out, was exactly why. Because not to minimize bailees, bailees was the movie industry problem. Bailees was stealing things from the manufacturer's loading docks or from shippers. But, yes, Your Honor, there was also a segment of the publishing industry that wanted that third thing. Breyer, I couldn't find a word. I could not find a word of that in the legislative history. Erwin Karp, who was the strongest representative for the publishers, said you couldn't do that 10 years earlier. So is there? No, but you just said yes in answer to Justice Ginsburg's question. So she'll find exactly what there is there. So I would like to know what it is. Your Honor, I was answering yes to, was this a motivation of the publishers? And if I misunderstood the question, Your Honor. But a motivation for 109 or a motivation for 602? A motivation for 602. When the conversation turned to 109, Your Honor, not a word was uttered about dividing distribution or divided markets. It was all about this problem. So on 602, you said that one of the things that they wanted was the segmentation of markets. They got half of it. They got the rogue distributors' half. And I guess Mr. Olson makes the point, and it seems a good one. He's like, that's a crazy half to have gotten. That's the kind that they don't need because they have a contractual remedy about against the distributors. And then they don't get people like, frankly, your client, who are rogue something else's with no contractual privity. And what sense does that make? Well, it makes perfect sense, Your Honor. Obviously, you know, the industry, at least back in 1976, did not get everything that they wanted. What they got was a much more powerful weapon than a contract. I mean, a copyright weapon gives you injunctive relief, gives you multiples of damages, which you don't get out of a contract remedy. But to Justice Breyer's point, because I think it's an important one, when you go to the history, and I think you are right, Your Honor, that there is exactly one thing  There is one spot in the drafting history where the relationship between 602 and 109 was discussed. It was that conversation between Karp and Goldman, who was the general counsel of the Copyright Office. It's on pages 11 to 12 of our reply brief. It's recited in extensive detail in the amicus brief that Costco submitted. And here's what happened. They got their importation provision, and Karp says, no, wait a minute. I don't get it. You've got this importation provision, and you've got this first sale doctrine. They're at war with each other. Which one wins? They seem to be agreeing that first sale wins, but they realize that there's this problem. And what they do, the general counsel of the Copyright Office says, we obviously haven't thought this through. We need to do more work on this, says the Librarian of Congress. And the next thing that happens, you see it in a red line on page 13 of our reply brief, is that for the first time in the drafting history, the two are reconciled by making 602 subordinate to 109 in exactly the way the Quality King found it to be. So the copyright owners got half the loaf. It may not have been the half that was more important to them, but they got a lot more from the extension of the importation provision. Kagan. Mr. Rosenkranz, there's that passage in Quality King which is, I think it's fair to say, unfortunate to your position. Is your basic view of that passage that it was simply ill-considered dicta that we should ignore? Rosenkranz. To put it bluntly, yes, that's my ultimate position. But I do think it can be reconciled with our position. Let's start with the question presented in Quality King is exactly the question that is presented here and the Court answered it yes, that is, do imports, is 109 applicable to imports? The whole driving logic of Quality King is about 109 trumping 602. And it's only in that Part IV where the Court is rebutting various attacks on its position that it gets to that dictum. And that dictum is in the third tier explanation to one of five rebuttals. I believe it can be reconciled, certainly in result. What you had there was the foreign distributor who had only British rights importing directly into the United States. There was never a first sentence. Well, in result, but not in reasoning. The passage specifically says this was presumably not to be lawfully made under this title. And I have an – I agree with you, Your Honor. I have an explanation. I offer it tentatively. I'm not sure whether it's right or not, either as to what the Court intended or under the statute. My hunch is the Court was thinking about a scenario where the British publisher only needs 10,000 copies to cover Britain, but instead what it does is to print 100,000 copies. Everyone would know that that is not authorized, it's not lawfully made under this title, because the intent is to send it over to the United States. So it's not lawfully made at that moment. Let me also just mention an important undergirding to our position, which is that our position is the only one that does not make a complete hash out of every uses of the same phrase – every use of the same phrase in the rest of the statute. Wiley's reading makes almost all of them nonsensical. So let me just give you an example. Section 110, the classroom provision. Wiley acknowledges this is the result, but doesn't explain why Congress would ever have wanted it. The result is that a teacher can go and buy a Beethoven record and play it to her class if it was made in the United States. But if she flips one past it to the next Beethoven record that happens to have been made in Asia, she can't play that for her class. Or Section 109C, the public display. The Buffalo Café owner is allowed to purchase something in the United States and put it up on her walls. They'll say a picture of Niagara Falls. That is permissible if it was made in the United States. But off the same retail rack, she flips one past if it was made in Asia. It's not permissible. Nor does Wiley explain why Congress would adopt an exception to the first sale doctrine that is not at all about sales, that is only about where copies were made. So a U.S. manufacturer who wants to sell into the U.S. market has this incentive to go and send jobs overseas. It's an irresistible incentive if the law is, if this Court says the law is what Wiley says. Has that ever happened? I mean, this, the Ninth Circuit cases have been around for some time. Has any manufacturer ever moved abroad? Your Honor, I'm sure it has. They haven't announced it. Now, let me just be clear. The Ninth Circuit came out with its opinion. This Court has intervened twice. So the law has never been settled in Wiley's favor. The courts were split. The moment that a manufacturer learns that this Court says you get what we call the holy grail of manufacturing, endless, eternal downstream control over sales and rentals, you can ruin secondary markets that are competing with you. The moment that happens, that will be yet another reason for manufacturers silently to decide that they're headed, that they're sending their manufacturing overseas. Scalia. Scalia. Of those courts that did hold the way your opponent would have it, am I correct that only one of them adopted the absolutist rule? Well, Your Honor, there are only three courts of appeals that have weighed in. But, yes, the Second Circuit is the only one that has adopted the absolutist rule. And that's yet another problem with Wiley's position. Wiley urges its position as a matter of statutory interpretation, but is refusing to stand by it. The moment it gets past the language of the statute, every argument it makes is an argument that is about tempering, you know, like a skyhook coming down from on high, tempering its interpretation in a manner that is completely inconsistent with the statutory law. The government argues, in effect, for a, what we might call it, a common law adaptation of Bob's Merrill. Yes, Your Honor, which is even, creates even more mischief. The government's position, as I understand it, is 109 doesn't have to do any work. In service of giving more birth, you know, greater magnitude to 602, we're going to make 109 completely superfluous because Bob's Merrill does all of the work. Now, 109, Congress said, it put into the statute, it said on every recodification to codify Bob's Merrill, and the government is now making 109 completely irrelevant, but picking and choosing, deciding that it wants the limitation on us from 109, but borrowing from Bob's Merrill some reservoir of law that modifies the For Sale Doctrine. If there are no further questions, I would like to thank you.   Kagan. Kagan. Mr. Ruzek, could I take you back to Justice Ginsburg's opening question? It just is a matter of copyright theory. I had always understood copyright to be the copyright holder has a kind of bundle of rights. It's not one right that applies everywhere in the world. You have your U.S. rights, and you have your Chinese rights. You have your rights under each jurisdiction's law. And your position is essentially to say that when I sell my Chinese rights to somebody, I'm also selling my U.S. rights to that same person, because the person who has the Chinese rights can just turn around and import the goods. I mean, that's the nature of your position, isn't it? That your U.S. rights are always attached when you sell more of your rights under the jurisdiction of another country. Ruzek. Well, so, first, Your Honor, back in 1976, this notion of geographic division was very, very new, so it's not at all clear what Congress was thinking with that respect to that. But secondly, no, we're not saying that when the owner sells his Chinese, its Chinese rights to the Chinese company, it is selling all rights. Certainly, the Chinese company cannot sell everywhere, but after that first sale, all of the manufacturer's rights are cut off. If I may reserve the rest of my time for the Court. Thank you, counsel. Thank you, Your Honors. Mr. Olson. Mr. Chief Justice, and may it please the Court. Petitioner's commercial enterprise is precisely what Section 602A1 was enacted to address, an international gray market in copyrighted works. This Court unanimously recognized in the Quality King case that 602A1 encompasses copies of books that were lawfully made not under the United States Copyright Act, but under the law of some other country. 602A is broader than 609A because it encompasses copies not subject to the first sale, but copies made under the law of another country. These are the words of every member of this Court in the Quality King case. Now, referring to it as dicta misstates what was going on in the Quality King case. The argument was that if you interpret 602A and 109A as allowing a defense, a first sale defense, you will emasculate Section 602A. And so the Court was explaining on page 147 and 148, I believe, why there were three reasons why 602A would have viability. And one of those reasons had to do with direct action against someone that was engaged in pirating, and some of it had to do with baileys and lessees. These are relatively small problems either otherwise dealt with by contract law or otherwise dealt with by the provisions of the statute. But the third reason for the Court's interpretation and its decision in that case was precisely the case that we're talking about here. Alitoso, it may be important dictum, but you really want to argue it wasn't dictum? It was the holding of the case? It was the holding of the case in the sense that it was necessary, the Court felt, and we could, you know, I don't feel I want to spend a lot of time arguing what the word dicta means, but it was a necessary ingredient to what the Court felt was an explanation for why it was deciding the case that it was necessary. Breyer, you don't need that. Your 602A has plenty of meaning. I mean, an American copyright holder licenses a British company to publish the work under British copyright law. 602A says he can't import the books into the United States, period. Now, the only debt so there's plenty of meaning there. The question is what happens when he sells it to his bookstore and you or I go in and buy it? And we want to give a copy to our wife when we get back to the United States. The question is, is that unlawful? Well, we're reading the provisions of the statute. Is that copy? Now, there are exceptions for the books that are brought in. No, no exception. I take it once I bring back five copies and I give one to my son. Well, there are fair use exceptions and there's other exceptions. Oh, fair use. Is it fair use? And there are exceptions for the one that you bring back for your wife. I'm sorry. Is your reading now that when the library imports in a book or a film or whatever it's importing in, it goes to the customs agent and it says to the customs agent, I don't have the express authorization of the copyright owner, but I'm a library, so I can import this book in? I'm a person who's bought the book in England and I'm bringing it to my wife. What provision gives me the right to do that? The provisions in the statute that deal with the libraries talk about bringing importing books for lending purposes. So deal with the wife. How does the wife get her book? What I'm saying is there what provision gives the wife a right under your reading? With respect to the copy brought in in the suitcase for to give to a family member or to turn over to someone else? No, to keep for yourself. As far as I understand your reading, I bought it abroad. I can't import it in. I believe that that is covered by the various provisions of the copyright statute. And the question is, is it covered by section 602A.1? Yes, it's an import of an acquired copy. Do you have a defense under the first sale doctrine? And I go to the exact explicit language of the statute. There may be exceptions under other provisions of the copyright law, but the first sale doctrine is not a law that is lawfully made under this title. Breyer. The reason I was trying to bring up, and I didn't do it artfully, is imagine Toyota, all right? Millions sold in the United States. They have copyrighted Stown systems. They have copyrighted GPS systems. When people buy them in America, they think they are going to be able to resell them. Now, under your reading, now, this is one of their horribles, I gather, and I want to know your answer to it. Under their reading, the millions of Americans who buy Toyotas could not resell them without getting the permission of the copyright holder of every item in that car which is copyrighted. Is that right? There may be just one. Please, am I right or am I wrong? Am I off-base or am I wrong? Am I right? There are other defenses, but that is not this case. This case is not how do you distinguish? The government would argue for a broader interpretation under what is made under the statute, whether that would include the importation or the distribution in commerce. That's an argument that the government makes, but it's not necessary to decide this case. Now, explain to me, because they are horribles, if I summarize them. Millions and millions of dollars' worth of items with copyrighted indications of some kind in them that we import every year. Libraries with 300 million books bought from foreign publishers that they might sell, resell, or use. Museums that buy Picassos that now, under our last case, receive American protection as soon as that Picasso comes to the United States, and they can't display it without getting permission from the five heirs who are disputing ownership of the Picasso copyrights. Those are some of the horribles that they sketch. And if I'm looking for the bear in the mousehole, I look at those horribles and there I see that bear. So I'm asking you to spend some time telling me why I'm wrong. Well, I'm — first of all, I would say that when we talk about all the horribles that might apply in cases other than this, museums, used Toyotas, books in luggage and that sort of thing, we're not talking about this case. And what we are talking about is the language used by the statute that does apply to this case. And that we need to know about that hypothetical in order to decide this case. And you're aware of the fact that if we write out an opinion with the rule that you propose, that we should, as a matter of common sense, ask about the consequences of that rule. And that's what we're asking. Exactly, Justice Kennedy. And that's what you were doing in the Quality King. When we were discussing with Justice Alito whether this is dicta or not, the Court was specifically saying what it would apply to, and what the Court was talking about in that case was books made not pursuant to this title, but pursuant to some other country's copyright law.  make a copy of a book. Sotomayor, why is it that a U.S. copyright owner who contracts in England to make books, he doesn't have an English copyright, he just simply chooses that place to manufacture as opposed to the U.S.? Why is he making that copy under English law and not under his rights of U.S. copyright? Well, if he is doing – if he's manufacturing the book in England, he's not – because the copyright law does not have extra-territorial application, he is not making those copies under this title. And this Court – But he's selling it no differently than Quality King was, or the Quality King – Well, the problem is the statutes may not be perfect with respect to this, and there is one set of interpretations of the statute, and the other interpretation of the statute is to interpret it as the conditioner – Mr. Olson, we know from the Carth Exchange that the response was, this is something we have to study with care, in 1976. The parade of horribles is now causing the Solicitor General and at least one, if not two, courts of appeals to write exceptions into the language to take care of what they perceive as horribles. Isn't it incumbent upon us to give the statute what is plainly a more rational, plain meaning, than to try to give it a meaning and then fix it because we understand that the meaning doesn't make sense? There is a body of the government of the United States that is entitled and capable of fixing this. These parade of horribles have been – people that have been arguing about these for years, for 30 years the statute has been interpreted the way that we are suggesting that it should be, under this title, which this Court earlier this year in another case, in the Norvo Nordis case, specifically said, under this title means pursuant to the provisions of this title. This Court said that before in the R. DeStany case. The under this title occurs not only in section 109A, but under this title occurs in 602A itself, and then under this section appears twice in section 602A. Ginsburg. Mr. Rosenkranz told us that under this title means different things in other sections. And he gave a number of examples. Yes. And in each case – first of all, if the interpretation that my opponent is arguing for was the law, that – those are the words that are in 602B and 602A, too. So Congress could have used those words that our opponents are arguing for and did use those words, one of which was written on the same time, in the same – passed in the same time, in 1976 at 602A. Well, Mr. Rosenkranz, can I just take you to the other provisions, Justice Ginsburg? The government specifically goes over each one of those, but each one of those, if you interpret the statute as under this title, as pursuant to this title, each one of those provisions makes sense in the context in which that term is used there. And there is only one real way to interpret under this title in the provisions in 109A in conjunction with 602A1, and that is the way the Court decided it in the King case, specifically looking at this question. Now, the facts were slightly different in the sense that that was a round trip. This isn't a round trip. Kagan. Can I take you back to the words here, lawfully made under this title, which you say clearly means what you say it means? So I find this language a little bit perplexing, and I can kind of see it both ways. So what you say is made under this title. That must mean made in the United States. And lawfully just is this little word that modifies that basic phrase, made under this title, which means made in the United States. But what Mr. Rosenkranz essentially says, he doesn't say it in these words, but he says the focus of this provision is on lawfully made. That's what the focus is on. It's on lawfully made as opposed to unlawfully made. Now, when we just say lawfully made, you know, we need something to measure, well, how do we know whether it's lawfully made? Well, you look to the rules in the copyright law. So if you just — if you focus more on the lawfully word, lawfully made, and then under this title, it doesn't mean made in the United States. It means lawfully made under the rules of this title. Lawfully made under this title is lawfully made under the copyright laws of the United States. It can't say lawfully made in the United States, because then something might — Kagan. Well, lawfully made under the rules of the United States, regardless where the thing was manufactured, is what I'm saying. That's the way — it just seems to me as though you're saying made must be manufactured, but lawfully made is a lawfully made copy. How do we know if it's lawfully made? We look to this title. I think under this title means that it was made pursuant to the provisions of the copyright law. I can't imagine the difficulties that would ensue with litigation over whether or not something made in another country, made under another country's different laws, and they vary enormously throughout the world, whether that was somehow compatible with the laws of the United States. Breyer. What about litigation in this respect? I want to bring you back to the horribles. Because the main point is that horribles haven't occurred, right? Sometimes horribles don't occur, because no one can believe it. Now, for example, I believe there's going to be a storm, but it hasn't started yet. So I would like to know, I would like to know, if you were the lawyer for the Toyota distributor, and if you were the lawyer for the Metropolitan Museum of Art, or you're the lawyer for a university library, and your client comes to you and says, my God, I just read this Supreme Court opinion, it says that we can't start selling these old books, or lending them, or putting them in our word processor, or reselling the Toyota without the permission of the copyright holder, who may or may not be Toyota itself, what, as their lawyer, do you tell them? Do you tell them, hey, no problem, or do you tell them you might become a law violator, or do you tell them I better litigate this? What do you tell them? Well, each one of those situations that you posit, Justice Breyer, has a whole panoply of set of facts with respect to the museums, with respect to the person bringing books into the United States. There are other defenses, including fair use. There are other defenses under the copyright law. But — and one of the things is that, to a certain extent, if you're going to use the product created by someone else in a way that's contemplated by the copyright laws, maybe it's required that you actually comply with the copyright laws by going to the owner of the copyright and saying, look, here's what I propose to do, can I have a license to do this? It's a nonprofit, it's a museum, and I'm — You said there are other defenses, including fair use. In the catalog that Justice Breyer recited, are all those fair uses? No. And some of what — Well, which ones are — I mean, it seems unlikely to me that if your position is right, that a court would say it's a fair use to resell the Toyota, it's a fair use to display the Picasso. It may be a fair use — it may be an implied license, for example, with respect to copyrighted items or trademarked items that appear in a product that was licensed abroad. The government has offered another alternative interpretation of the word made as putting it in the flow of commerce. That might deal with some of these situations. But the point, I guess, I'm making, Mr. Chief Justice, is that Congress was clearly intending to talk about the vast gray market problem. This — the provision — Well, intending where? I mean, I — you spend a lot of time talking about the legislative history and the purposes behind 602. But the language that we're supposed to be interpreting is the language in section 109. And the language in section 109, as far as I can see, there's really nothing to support your argument that that language was intended to address this gray market problem. Isn't that correct? Well, no. I think that section 109 and 602a were adopted in the same statute. They were put in the draft of the statute at the same time in 1964. But, you know, section 109 is just a rewording of a prior provision that you would clearly lose under, where the prior wording had nothing to do with where any product was manufactured. And what you're suggesting is that we should read this change in wording, which actually there's a real theory behind what the change in wording meant that has nothing to do with the place of manufacture, that we should read it as incorporating a place of manufacture requirement because there was a separate debate going on in section 602 about that question. But the two — what I'm — I guess I'm trying to explain is that the two were enacted at the same time. They were out there and available to the public for 12 years before they were finally adopted. These parade of horribles could have been addressed by Congress in a different way at the time, and the interpretation — this is a — 109 is a defense, is offered as a defense to section — to section 602a1. So what does it mean? What provide — what is the defense that's provided? And you then have to interpret, made under this — lawfully made under this title, what does that mean? And you have done that in the Quality King case. You explained in the Quality King unanimously that it makes a difference because you're exhausting — Congress intended to allow segmentation of the market. It only makes sense to interpret this way if you allow segmentation of the market pursuant to these provisions because it is exhausting the copyright under the laws of the United States once you make a sale of a product produced in the United States subject to the United States copyright laws. You're not exhausting your U.S. copyright when you make something or allow something to be made abroad. You're not exhausting that copyright. You have not done that yet. So the first sale is not something that happens abroad that uses up the copyright laws — the protection under the copyright laws of the United States. So it seems to me that this does make perfect sense, and it makes — it is not going to be a perfect solution in every case. The Court has dealt with that frequently with respect to copyright laws. But if you interpret it as my opponent interprets it, you are opening the door to commercial enterprises precisely like this. It's not necessary in this case to decide every single permutation of a problem that someone crosses a border with a product. But this Section 602 specifically contemplates products that are acquired abroad and then brought back into the United States. Here, we have a commercial enterprise doing exactly what is contemplated by the people who are talking about 602A and Section 109 when the two were adopted at the same time. Ginsburg. Mr. Olson, do you have an answer to the outsourcing problem and the charges that if we read the statute as you are urging, then you are inviting the outsourcing of manufacturing jobs? Olson. There are several answers to that. One, that's Congress's concern, and there is no evidence that that would really actually happen. And Congress was concerned with creating a segmentation of the market. But it's entirely speculative as to whether or not people are going to start manufacturing books or other items outside the United States. Congress can address that if that should become a problem, but it's not something that was suggested as a part of what was taking place at that time. Thank you, Mr. Olson. Mr. Stewart. Mr. Chief Justice, and may it please the Court, I would like to discuss — begin by discussing our Bobbs-Merrill argument, because it's part of our brief that's in both the parties' submissions, and I do think it's very important to understanding the practical implications of the Court's decision. Ginsburg. Mr. Stewart, may I ask you a preliminary question? Sure. In Quality King, the government took the position that the Petitioner is taking here. What led the government to change its mind? Was it just what has been called the dictum in Quality King, or is there another reason why the government has switched sides? I think there are two related reasons, and one of them is the dictum, but I'll get to that second. I think in both cases our overriding objective was to offer a reading of section 109A that would not supersede or would not effectively negate the importation prohibition in section 602A1, because from the Copyright Office's perspective, we agree with Mr. Olson that the primary reason for the enactment of 602A1 was to facilitate market segmentation. And the argument we made in Quality King was you can accomplish that, you can prevent 109A. Could you point to something in the legislative history to support that? I think the best thing I could point to is a report of the Register of Copyrights that was issued in 1965 in which the Copyright Office identified as one of the circumstances that would be covered by the importation ban the situation in which, quote, the copyright owner had authorized the manufacture of copies in a foreign country for distribution only in that country. It didn't use the phrase market segmentation, but clearly the point was the same. You are authorizing copies to be made abroad for distribution only in that place, not for redistribution here. And so in part of that, I think that's a good argument. Kagan. So, Mr. Stewart, if I understand your argument, both here and in Quality King, you want the copyright holder to have some control over importation, but at the same time, you don't want the copyright holder to have control over all downstream sales. And that's what your Bobbs-Merrill argument is designed to do. It's designed to prevent that. Coming back to Justice Ginsburg's question, do you think that truly the way to do those two things, to give the copyright holder control over importation, but not over downstream sales, that our problem really is, do you think in your heart of hearts, that we got it wrong in Quality King? Stewart. Well, we lost that case 9-0, and so I'm not arguing too vociferously that the Court should change its opinion. But, yes, we think that we still would adhere to our view that section 109A should not be read as a limitation on section 602A1. If the Court had gone that path, it could read lawfully made under this title to encompass both foreign-made and domestic-made copies without doing damage to the copyright holder's ability to segment markets. On the other hand, if you get what you wanted anyway, that's really the bottom line. We undo Quality King, except that the price is that people have to just ship their manufacturing. Well, we're not urging the Court to take that course, but, yes, that would have been one way to accomplish the same objective. And so we're essentially saying that the appropriate way to read the statute to make sense of all of its provisions is to give the copyright holder control over the importation, to give Wiley the ability to go after this importer, Mr. Kerstan, but to find a way to stop it there. I think that's correct, but I think our Bobbs-Merrill argument does provide a very principled way to stop it there without going back on what the Court said in Quality King. That is, Bobbs-Merrill was a 1908 case in which the publisher sold books to retailers on the proviso that they not be sold at retail for less than a specified amount. One of the retailers violated that resale restriction and was sued for copyright infringement. And this Court in Bobbs-Merrill said, parsed the statutory language which at that time gave the copyright owner the exclusive right to vend copies of the work. Alitoso, you're saying Bobbs-Merrill means something beyond section 109. But when the 1909 Copyright Act said that it was codifying the holding in Bobbs-Merrill and the 1976 statute, which is now before us, said it wasn't changing the meaning of the earlier law. So I don't know how — Bobbs-Merrill isn't a constitutional decision. It's a question of statutory interpretation. So how does some sliver of Bobbs-Merrill still survive all of this? Maybe I can put it this way. If I buy a paradical copy of a book, one that was illegally made without the consent of the copyright owner, and all I do is read it and put it on my shelf, I can't rely on 109A because the copy was not lawfully made under this title. But I still couldn't be held liable for copyright infringement because there is no exclusive right to read the book or to own it. I wouldn't have been infringing any of the copyright owner's rights. And so in order to have a valid claim for copyright infringement, the copyright owner would have to show both that 109A was inapplicable and that what the defendant was doing was a violation, an infringement of one of the exclusive rights. And Mr. Rosenkranz seems to postulate a situation in which a KG manufacturer would locate its facilities overseas, make the copies there, import them into the United States, sell them in this country subject to conditions on resale. And if the goods were resold in violation of those restrictions, the copyright owner would sue for infringement. And I think the first argument the defendant would make is that is exactly the conduct that the Court in Bobbs-Merrill said did not infringe the exclusive right to vend, namely the resale in violation of restrictions on resale. How can you say it's now an infringement of the exclusive right to distribute? And it would be a particularly difficult argument for the copyright owner to make because what the House report said in 1909, it didn't say exactly that it was codifying the holding of Bobbs-Merrill. It said that it was amending the statute in other respects, and it wanted to make clear that there was no intent to enlarge the exclusive right to vend. And so the plaintiff in Mr. Rosenkranz's hypothetical would in effect be arguing that by codifying section 109A, Congress had implicitly expanded the scope of the implicit of the exclusive right to vend or distribute, even though it said it was doing various opposite. Roberts. Roberts. That's an awfully difficult maze for somebody to get through. You have to start with the difficulty of the language here, and then you have to proceed and put the Quality King gloss over it. And when you finally get to that point, you say, well, now you've got to read Bobbs-Merrill and figure out how the common law governs all that. But I think that would be true under anybody's reading. That is, once a court in a case determined for whatever reason that section 109A was inapplicable, it didn't provide a safe harbor, the next step could never be simply to proceed to judgment and say that there was infringement. The next step would always have to be to look at what the defendant had done. Roberts. Well, it's not that complicated under the Petitioner's approach. It says once you've had a first sale, that's it. The other point I would make about the Petitioner's approach is that it really has no grounding in the statutory text. That is, the Petitioner is arguing that if the publisher in Thailand, if the manufacturer of the books had shipped them directly into this country, that person could have been sued for infringement for the importation and the importation of the books. Breyer. Look, where it has grounding is Cook v. Littleton, 1628, where it says that if a man be possessed of a chattel and give herself his whole interest upon a condition, that condition is no good. And Cook says, and that's how it should be. And now that's picked up in Bobbs-Merrill. It's picked up in Dr. Miles. It's been the law. Now, if in fact there are two ways of interpreting a statute, and one is consistent with that basic principle of commercial law, and the other produces some of the complexities that you have just mentioned, isn't it better to go with the common law and simply reaffirm a principle that's been in the commercial law almost forever? I give two answers to that. And the first is that Cook was saying that in most circumstances, at least, a sale is sufficient in order to divest the owner of his prior right to control distribution, but it doesn't say that a sale is necessary. And my point is that when Mr. Rosencrantz says the hypothetical foreign publisher who makes copies with authorization but ships them into the United States without could be held liable for infringement, there's nothing in Section 109A that would allow a court to draw that distinction. That is, although 109A is sometimes referred to as a codification of the first sale doctrine, it doesn't require an antecedent first sale. And so as long as the foreign publisher was the owner of the books at the time they were manufactured, if those books were lawfully made under this title, under Petitioner's reading, they could be imported and distributed. We know also that this was not an oversight, that Congress didn't intend the provision to be subject to a sort of implicit first authorized sale requirement, because the language was intended to cover copies that were made pursuant to a compulsory license. Alitoso, which of the following is worse, all of the horribles that the Petitioner outlines to the extent they are realistic, or the frustration of market segmentation to the extent that would occur if the Petitioner's position were accepted? Stewart. Well, if they actually happened, then I think the horribles would be worse. But as I say, we feel that we have offered a reading of all the statutory provisions together that would avoid both. The other couple of things I would say as to why a first sale by itself. Alitoso, if that middle ground were found to be not viable, which of the two sets of consequences is worse from the government's perspective, or can you not say? Stewart. I would say that the consequence that all foreign-made goods, even if imported into the United States with the authorization of the U.S. copyright owner, are subject to continuing licensing requirements, et cetera. I would say that would be worse than the frustration of market segmentation that would occur under Petitioner's view. Thank you, counsel. Mr. Rosenkranz, you have 4 minutes. Thank you, Mr. Chief Justice. I just want to step back and just take a look at what the government's doing here. After eloquently arguing in Quality King in the last two pages of its brief that our position on the meaning of this language is right, it's saying our position is wrong. And then it's trying to come up with a middle ground that has absolutely no basis in the statute. If Bob's Merrill provides the content for the first sale doctrine, then what does Section 109 do? And so the government is creating a scenario in which in order to save 602 from being superfluous in the way it is described, although we believe it's not superfluous at all, it is making 109 superfluous. Justice Kagan asked a question about essentially sentence diagramming. Our view is that under this title, modifies lawfully. You use the U.S. metric of U.S. law to figure out whether it's lawful. The government's and Wiley's position is that under this title, modifies both made and lawfully. And at least the way I learned grammar, you can't use the same phrase to modify both terms. I want to correct something that I said to Justice Ginsburg, because I said it backwards. 905 and 906 are examples of the United States Congress in a copyright context applying national exhaustion, and that was 6 years after this statute was passed. To Justice Breyer's question, the bear is there. It is very much there. The only reason no one has ever pursued these legal arguments is that the legal arguments that are the baseline for all of this have yet to be accepted by this Court, but I have not heard any argument for why the vast majority of them will not necessarily obtain, and they are not in any of the briefs, to use the Toyota example, there simply is no other defense. There's none. Fair use doesn't apply to the vast majority of the scenarios that I have just described. Finally, outsourcing. Congress did not want U.S. jobs to go overseas. Congress in the very same statute in Section 601 was hoarding manufacturing jobs to the United States. And as the government said on the last page of its Quality King, it is highly unlikely that the same Congress that hoarded jobs in the United States was prepared to tolerate a situation in which there was eternal downstream control that the copyright owners would be encouraged to seize by sending jobs overseas. So unless there are further questions from the Court, I just realized I said the same thing twice incorrectly to Justice Ginsburg. 905 and 906 are examples of international exhaustion. Unless there are further questions, I thank the Court and respectfully request that the Court reverse the judgment below. Roberts.